06-4137-cv
*Barfield v. N.Y. City Health & Hosps. Corp.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: December 17, 2007　　　　　　　　　　Decided: August 8, 2008)

Docket Nos. 06-4137-cv (L), 06-4310-cv (xap)

ANETHA BARFIELD,

Plaintiff-Appellant-Cross-Appellee,

—v.—

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION,
BELLEVUE HOSPITAL CENTER,

Defendants-Appellees-Cross-Appellants.[1]

Before:

JACOBS, *Chief Judge,*
CALABRESI, and RAGGI, *Circuit Judges.*

_____

In an action for overtime pay under the Fair Labor Standards Act of 1938 ("FLSA"),

29 U.S.C. § 201 et seq., the parties cross-appeal awards of summary judgment and attorney's

---

[1] The Clerk of the Court is directed to amend the official caption as set forth above.

fees entered in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) in favor of plaintiff, a certified nursing assistant who was referred exclusively to Bellevue Hospital for temporary work assignments by three separate health care referral agencies. Plaintiff appeals that part of the judgment awarding her reduced attorney's fees in light of her failure to secure certification of this case as a collective action under the FLSA. Defendants cross-appeal the district court's merits determination that, as a matter of law, Bellevue qualified as plaintiff's joint employer with the referral agencies and, as such, was responsible for plaintiff's overtime pay for work in excess of 40 hours per week pursuant to the FLSA. Defendants further cross-appeal the district court's decision to award plaintiff unpaid wages, liquidated damages, and attorney's fees and costs, even in the absence of any finding of bad faith.

AFFIRMED.

ABDOOL HASSAD, Jamaica, New York, *for* Plaintiff-Appellant-Cross-Appellee.

LORIE E. ALMON (Gerald L. Maatman, Jr., Christopher H. Lowe, *on the brief*), Seyfarth Shaw LLP, New York, New York, *for* Defendants-Appellees-Cross-Appellants.

REENA RAGGI, *Circuit Judge*:

Plaintiff Anetha Barfield is a certified nursing assistant who, at times relevant to this case, was directly employed and paid by three referral agencies, each of which arranged for

2

her to work on a temporary basis at a single facility, defendant Bellevue Hospital Center ("Bellevue"), which is operated by defendant New York City Health and Hospital Corporation ("HHC"). As a result, Barfield sometimes worked at Bellevue for a total of more than 40 hours per week, although never for more than 40 hours at the behest of a single referral agency. In an action filed in the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*), Barfield, on behalf of herself and a class of similarly situated temporary health care employees, sued Bellevue and HHC for overtime pay pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 et seq. Although the district court entered summary judgment in favor of Barfield on May 30, 2006, see Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d 390 (S.D.N.Y. 2006), and awarded her unpaid overtime, liquidated damages, and attorney's fees and costs, she appeals the attorney's fee award, faulting the district court for reducing its lodestar fee calculation by 50 percent to account for plaintiff's failure to secure collective action certification, see Barfield v. N.Y. City Health & Hosps. Corp., No. 05 Civ. 6319 (JSR), 2006 WL 2356152, at *1, *3 (S.D.N.Y. Aug. 11, 2006). Defendants, in turn, cross-appeal the district court's determination that, as a matter of law, Bellevue qualified as plaintiff's joint employer with the referral agencies and, as such, was liable for her overtime pay as provided in the FLSA. Defendants further assert that the district court abused its discretion in awarding liquidated damages to plaintiff in light of the FLSA's "good faith" exception. See 29 U.S.C. § 260. We identify no merit in the parties' arguments, and we affirm the challenged judgment in all respects.

3

## I. Factual Background

### A. Bellevue and Its Reliance on Referral Agencies

Founded in 1736, Bellevue is the oldest public hospital in the United States. On an annual basis, it presently treats 26,000 inpatients and 500,000 outpatients, and handles 94,000 emergency visits. Although Bellevue is the flagship facility of the HHC, which oversees its budget operations, Bellevue makes staffing decisions independent from its parent, employing thousands of individuals on its payroll and supplementing these payroll employees, as need arises, with temporary personnel supplied by referral agencies.

Bellevue relies on at least eleven different referral agencies on a non-exclusive basis to supply it with individuals qualified to serve temporarily in a variety of health care positions. These referral agencies provide training for their "agency employees"; the agencies also ensure that their employees hold the proper certifications and qualifications required for each assignment. While Bellevue provides its own payroll employees with malpractice insurance, it expects agency employees to carry their own insurance or to obtain such coverage through their referral agencies. The specific terms and arrangements that Bellevue has with each referral agency differ, but the basic payment structure is the same: Bellevue pays all referral agencies a flat hourly rate for the services of temporary employees; the agencies, in turn, pay an hourly wage to the employees, which represents a portion of the fee received from Bellevue.

After making arrangements with a referral agency for temporary certified nursing

4

assistants, Bellevue generally contacts the referred individuals directly to advise as to the shifts that will likely need coverage. Bellevue requires temporary nursing assistants to call the hospital two hours before the start of the identified shifts to determine whether their services are, in fact, required. When agency-referred nursing assistants arrive at Bellevue, they sign in on designated sheets, indicating both their own name and that of their referring agency. A Bellevue supervising nurse signs off on these sheets, verifying the number of hours worked by each agency-referred nursing assistant. Bellevue then provides records of the hours worked by agency employees to their respective referral agencies.

B.      Anetha Barfield

Plaintiff Anetha Barfield is a certified nursing assistant who, through agency referrals, worked temporary assignments at Bellevue from August 2002 to May 2005.[2] The first agency to refer Barfield to Bellevue, Ultra Care of Manhattan, required her to sign a copy of its written policies and procedures, which advised her, inter alia, that "[a]ll employees are restricted to a maximum of forty (40) hours per [weekly] pay period." Ultra Care of Manhattan Policies & Procedures #10. In a declaration filed in support of her motion for summary judgment, Barfield stated that UltraCare had told her that she could not work more than 40 hours through them because Bellevue would not pay overtime. Barfield thereafter registered with two other referral agencies, which independently assigned her to work at

_____

[2] It appears that Barfield worked exclusively at Bellevue Hospital during this time.

5

Bellevue. As a result, there were sixteen weeks between October 20, 2003, and January 31, 2005, when Barfield worked a total of more than 40 hours per week at Bellevue, even though she never worked more than 40 hours in a week for any single referral agency. It is undisputed that Barfield did not receive overtime pay for any hours worked in excess of 40 per week, either from her referral agencies or from Bellevue.

### C. The Instant FLSA Action

On behalf of herself and a class of others similarly situated, Barfield sued Bellevue and HHC for violating the overtime provision of the FLSA, 29 U.S.C. § 207(a)(1).

#### 1. Denial of Collective Action Certification

The district court declined to certify Barfield's suit as an FLSA collective action, ruling that the "limited anecdotal hearsay" she proffered to support a widespread problem of temporary hospital employees working more than 40 hours per week without overtime compensation was inadequate to make even the "modest factual showing" necessary to demonstrate that plaintiff and potential class members "together were victims of a common policy or plan that violated the law." Barfield v. N.Y. City Health & Hosps. Corp., No. 05 Civ. 6319 (JSR), 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (internal quotation marks and citations omitted).[3] The case consequently proceeded on Barfield's claim alone.

#### 2. The Award of Summary Judgment in Favor of Plaintiff

_____

[3] Because this decision is not before us on appeal, we have no reason to discuss its merits.

a.      Defendants' Responsibility for Barfield's Overtime

After discovery concluded, the parties cross-moved for summary judgment on the question of liability. The district court observed that, because Barfield "was paid, and in that sense employed, by the nursing referral agencies," the "critical" liability question was "whether Bellevue was also Barfield's 'employer' under the terms of the FLSA." Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 392; see also 29 C.F.R. § 791.2 (stating that individual may be employed by more than one entity at same time). In addressing this issue, the district court looked to six factors identified in Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003) (identifying factors relevant to determining whether "entity has functional control over workers even in the absence of . . . formal control" so as to qualify as employer). See Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 392-94.[4] With regard to the first four factors, the district court concluded that

_____

[4] The district court accurately described Zheng's test for functional control as follows:

> "(1) whether [defendants'] premises and equipment were used for the plaintiffs' work; (2) whether the [referral agencies] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [defendants'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [defendants] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [defendants]."

Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 392-93 (quoting Zheng v. Liberty Apparel Co., 355 F.3d at 72) (alterations in original). We review de novo the

7

it was undisputed that (1) Barfield performed her work on Bellevue's premises using Bellevue's equipment; (2) no referral agency shifted its business as a unit from one putative joint employer to another, but, instead, each agency assigned the same agency employees to the same hospitals whenever possible — in Barfield's case, to Bellevue — "in order to promote more continuity of care and to increase the productivity of the nurses and the value of their services"; (3) Barfield performed work integral to Bellevue's operation; and (4) Barfield's work responsibilities remained the same regardless of which agency referred her. Id. at 393 (internal quotation marks omitted). With regard to Zheng's supervision factor, the district court concluded that the evidence established as a matter of law that (5) Bellevue "demonstrate[d] effective control on the terms and conditions of the plaintiff's employment" in light of Bellevue's degree of control over Barfield's schedule. Id. (internal quotation marks omitted). Although Bellevue disputed that it scheduled shifts directly with agency health care employees, the district court noted that Bellevue conceded its frequent communication of tentative work shifts to referred employees, requiring them to call the hospital a few hours before the start of these shifts to confirm the assignments. See id. In addition, the district court found that, on several occasions, Bellevue solicited Barfield to work a double shift even before she began the first assignment. See id. The district court further observed that it was undisputed that (6) Barfield worked exclusively for Bellevue.

application of the Zheng analysis to this case infra at **[22-31]**.

8

See id. at 394. Thus, the district court concluded that all of the Zheng factors "point, to a greater or lesser degree, toward plaintiff's being employed by Bellevue." Id.

To the extent Zheng advised further consideration of "any other factors" that a court "deems relevant to its assessment of the economic realities" of a given employment situation, id. (quoting Zheng v. Liberty Apparel Co., 355 F.3d at 71-72), the district court found it undisputed that Bellevue "exercise[d] at least some control over which agency nurses are permitted to work for the hospital" because it regularly evaluated the performance of agency employees and could prohibit particular employees from working further at Bellevue and receive overtime either because it determined that the individual had violated a hospital rule or because it was generally dissatisfied with the individual's performance. Id. Accordingly, the district court concluded that the "circumstances of the whole activity viewed in light of economic reality demonstrate[] that Bellevue exercised functional control over plaintiff and was her joint employer." Id. (internal quotation marks omitted).

Defendants asserted that, even if the district court concluded that Bellevue was Barfield's joint employer under the FLSA, plaintiff was not entitled to recover overtime wages for two reasons: (1) at least one of Barfield's referral agencies had specifically informed her that she could not work more than 40 hours per week at Bellevue, and (2) Barfield's use of multiple referral agencies to secure assignments to Bellevue prevented defendants from determining how many hours she had worked at the hospital. See id.

In rejecting these arguments, the district court determined that Bellevue could not rely

9

on the agency's notice of limited temporary work hours at the hospital to avoid FLSA liability because Bellevue itself had never informed Barfield of any such restriction on her overall employment at the hospital. See id. The district court further observed that Bellevue did not dispute that Barfield had filled out the sign-in sheets Bellevue provided for temporary workers, that the hospital had collected these sheets and cross-referenced them against work verification forms signed by supervising nurses after each shift, and that Bellevue employees had encouraged Barfield to work extra shifts beyond those scheduled in advance. See id. at 394-95. Finally, the court noted undisputed evidence that at least one Bellevue supervisor was aware that temporary health care workers were sometimes referred to the hospital by multiple agencies. See id. at 395. On this record, the district court determined that no other conclusion was possible than that Bellevue knew or had reason to know the total number of hours Barfield worked for them each week, making them responsible for overtime compensation when those hours exceeded 40. See id. at 394-95.

b.    The Award of Damages, Costs, and Fees

Having concluded, as a matter of law, that Bellevue was liable under the FLSA for Barfield's overtime compensation, the district court awarded her compensatory overtime in the amount of $887.25. See Barfield v. N.Y. City Health & Hosps. Corp., 2006 WL 2356152, at *1, *3. Further, having observed that nothing in the record indicated that defendants had made any effort to ensure that their employment of temporary health care workers complied with the FLSA, see Barfield v. N.Y. City Health & Hosps. Corp., 432 F.

10

Supp. 2d at 395, the district court ordered defendants to pay Barfield liquidated damages in an equal amount, for a total damages award of $1,774.50, see Barfield v. N.Y. City Health & Hosps. Corp., 2006 WL 2356152, at *1, *3.[5]

Insofar as Barfield also sought costs and fees, the district court directed defendants to pay costs in the amount of $6,565.79, see id. at *3, but it declined to award attorney's fees in the requested amount of $340,375. In determining for itself what constituted a reasonable fee for the case, the district court found that Barfield's counsel's hourly rate of $350 was consistent with his level of experience. See id. at *1. Nevertheless, the court imposed a 25 percent reduction on almost 400 hours that counsel charged to the case because "the vague nature of many of the entries" made "it impossible to determine whether the number of recorded hours expended in pursuit of this litigation was reasonable." Id. Indeed, the district court found it "obvious" that the "total of nearly 400 hours that plaintiff's counsel says he spent on this case seems entirely disproportionate to the time the case reasonably should have involved." Id. The court further determined that 5.75 hours billed by counsel involved tasks that should have been performed by a paralegal; consequently, it concluded that this time should be compensated at only $75 per hour. See id. at *2. Similarly, the district court determined that 2.3 hours of travel time by counsel should be compensated at half-rate, in

_____

[5]We do not here concern ourselves with a small typographical error in the "cents" component of the liquidated damages award, because the total award accurately represents twice the unpaid wages. See Barfield v. N.Y. City Health & Hosps. Corp., 2006 WL 2356152, at *3.

11

accordance with established court custom, and that 4 spent on administrative tasks should not be compensated at all. See id. Finally, the district court rejected defendants' request to eliminate from consideration all time spent by Barfield's counsel in seeking to certify the case as an FLSA collective action, finding that plaintiff's certification application was "inextricably intertwined" with her successful motion for summary judgment as both involved a "'common core of facts'" and a "'related legal theory.'" Id. (quoting Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1998)). Nevertheless, after determining the lodestar figure, the district court invoked its "authority to adjust the lodestar to reflect a number of factors, including the results obtained." Id. The district court concluded that "plaintiff's primary aim in this litigation," as reflected in both the "complaint and in the first four months of litigation before this Court," was collective action certification. Id. Because plaintiff (and her counsel) had failed in this objective, the district court concluded that Barfield had achieved only "limited success in the litigation as a whole," which justified a 50 percent reduction in the lodestar. Id. at *3 (explaining that award of full lodestar amount "would be tantamount to awarding a fee as if plaintiff had prevailed on her collective action motion, a result which would hardly encourage counsel to vigorously litigate such motions and could encourage counsel to bring them even when there is little basis for doing so"). Accordingly, the district court awarded $49,889 in attorney's fees, which, when added to the compensatory and liquidated damages and costs, yielded plaintiff a total award of $58,229.29. See id.

12

The parties filed cross appeals, Barfield challenging the judgment awarding attorney's fees and defendants challenging the summary judgment determination liability.

## II. Discussion

### A. Bellevue Is Liable for Barfield's Overtime Pay Under the FLSA

#### 1. Standard of Review

We review an award of summary judgment de novo, and we will uphold the judgment only if the evidence, viewed in the light most favorable to the party against whom it is entered, demonstrates that there are no genuine issues of material fact and that the judgment was warranted as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008). The record in this case satisfies this standard.

#### 2. Barfield's Claim that Bellevue Was Her Joint Employer

The overtime provision of the Fair Labor Standards Act states in pertinent part that "no employer shall employ any of his employees . . . for a workweek longer than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). In identifying the persons or entities who qualify as "employers" subject to this provision, statutory definitions sweep broadly. "Employer" includes "any person" other than a labor organization "acting directly or indirectly in the interest of an employer in relation to an employee." Id. § 203(d). With a number of

13

exceptions not applicable here, "employee" references "any individual employed by an employer." Id. § 203(e)(1). "Employ" is defined to "include[] to suffer or permit to work." Id. § 203(g).

Barfield concedes that the three agencies with whom she registered for placement in hospital health care positions each qualified as her employer. See Brock v. Superior Care, Inc., 840 F.2d 1054, 1061 (2d Cir. 1988) (holding that health care agency was employer of nurses whom it referred for various placements); see also Chao v. Gotham Registry, Inc., 514 F.3d 280, 286 (2d Cir. 2008) (noting concession by agency that it qualified as employer of nurses whom it referred to hospitals for temporary assignments). She contends, however, that Bellevue also qualified as her employer and, as such, was obligated to comply with the FLSA overtime provision for any work she performed at the hospital in excess of 40 hours per week, even if no single agency ever referred her for that amount of time.

Defendants acknowledge that federal regulations and our precedent recognize the possibility of joint employment for purposes of determining FLSA responsibilities. See 29 C.F.R. § 791.2(a); Zheng v. Liberty Apparel Co., 355 F.3d at 66. Indeed, § 791.2(a) speaks directly to joint employer responsibility for overtime, stating that "all joint employers are responsible, both individually and jointly, for compliance with all the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek," although "[i]n discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments

14

made to the employee by the other joint employer or employees."  Bellevue nevertheless contends that the district court erred in concluding, as a matter of law, that it qualified as Barfield's joint employer.

3.  The Economic Realities Test for Determining Who Qualifies as an Employer Under the FLSA

In instances where Congress uses terms – such as employer and employment – "that have accumulated settled meaning under . . . the common law," courts generally infer, unless the statute indicates otherwise, that "Congress means to incorporate the established meaning of these terms," e.g., "the conventional master-servant relationship as understood by common-law agency doctrine."  Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-23 (1992) (internal quotation marks omitted).  The Supreme Court has observed, however, that the "striking breadth" of the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles," id. at 326, in order to effectuate the remedial purposes of the act, see, e.g., United States v. Rosenwasser, 323 U.S. 360, 363 (1945).  See also Rutherford Food Corp. v. McComb, 331 U.S. 722, 729 (1947) ("This Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.") (internal quotation marks omitted); accord Frankel v. Bally, Inc., 987 F.2d 86, 89 (2d Cir. 1993) (noting courts' recognition of "the expansive nature of the FLSA's

15

definitional scope" as beyond the common law agency test in light of "the remedial purpose underlying the legislation"). Accordingly, the Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in "economic reality rather than technical concepts," Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961) (internal quotation marks omitted), determined by reference not to "isolated factors, but rather upon the circumstances of the whole activity," Rutherford Food Corp. v. McComb, 331 U.S. at 730.

As a result, this court has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances. See Carter v. Dutchess Cmty. Coll., 735 F.2d 8, 12 n.1 (2d Cir. 1984). In assessing the "economic reality" of a particular employment situation, we have identified different sets of relevant factors based on the factual challenges posed by particular cases.

For example, in Carter v. Dutchess Community College, 735 F.2d 8, prison inmates conducting classes in a program managed by a community college asserted that the college should be viewed as their employer and obligated to pay them in accordance with the FLSA's minimum wage requirements. The district court was not persuaded, observing that the college had only "qualified control" over the inmate instructors; the Department of Correctional Services always maintained "ultimate control." Id. at 11-12. This court rejected "ultimate control" as the determinative factor of an entity's status as an employer, because such a rule would not comport with the "remedial" purpose of the FLSA, which Congress

16

intended to "have the widest possible impact in the national economy." Id. at 12. Instead, we cited four factors that better determine the "economic reality" of a putative employment relationship, specifically, "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" Id. (quoting Bonnette v. Calif. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1983))[6]; accord Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 139 (2d Cir. 1999) (applying Carter factors, reiterating that absolute control is not determinative of employer status, and noting that "[c]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence" (internal quotation marks and alterations omitted)).

In Brock v. Superior Care, Inc., 840 F.2d 1054, defendant health care agency challenged a district court determination, made after a bench trial, that it qualified as the employer of nurses it referred for various assignments. In rejecting the agency's argument that the nurses were properly viewed as independent contractors rather than agency employees, we employed a more expansive test than was set forth in Carter to determine the

---

[6]Applying these factors in Carter, we concluded that the college's possible status as an employer could not be determined on the existing record. Accordingly, we remanded the case for further consideration of the issue by the district court. See Carter v. Dutchess Cmty. Coll., 735 F.2d at 14-15.

17

economic reality of the parties' relationship. We concluded that the following factors, derived from United States v. Silk, 331 U.S. 704, 716 (1947) (considering question of employment in context of Social Security Act), demonstrated that the agency qualified as the nurses' employer:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Brock v. Superior Care, Inc., 840 F.2d at 1058-59. In so holding, however, we emphasized that "[n]o one of these factors is dispositive," nor were they, as a whole, "exclusive." Id. at 1059 (observing that "test" for determining an employer-employee relationship must consider "the totality of the circumstances"; thus, "any relevant evidence may be considered" and "mechanical application" of any set of factors "is to be avoided").

Our more recent holding in Zheng v. Liberty Apparel Co., 355 F.3d 61, reiterates the necessary flexibility of the economic realities test. In Zheng, we considered whether an entity that lacked formal control over workers — as defined by the four Carter factors — could nevertheless be considered their employer based on its exercise of functional control. The context of the inquiry was the garment industry, where apparel manufacturers contracted with various subcontractors to stitch and finish pieces of clothing on the latters' premises according to the manufacturers' specifications. The district court had concluded that defendant garment manufacturer did not qualify as an FLSA employer under the four factors

18

identified in Carter. See id. at 64. In remanding the case, we explained that, while satisfaction of the four factors in Carter "can be sufficient to establish employ[ment] status," we had never held "that a positive finding on those four factors is necessary to establish an employment relationship." Id. at 69 (emphasis in original). Relying on language drawn from Rutherford Food Corp. v. McComb, 331 U.S. at 724-25, Zheng set forth a six-factor test "pertinent" to identifying the "economic realities" of the employment relationship "in these circumstances," 355 F.3d at 72. These factors asked

> (1) whether [the garment manufacturer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the garment manufacturer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [garment manufacturer] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the garment manufacturer].

Id. Zheng concluded that because these factors weighed in plaintiff's favor, they demonstrated that the garment manufacturer had "functional control over workers even in the absence of the formal control measured by the Carter factors." Id.

From this precedent, we conclude that the various factors relied upon by this court (1) to examine the degree of formal control exercised over a worker, see Carter v. Dutchess Cmty. Coll., 735 F.2d at 12; (2) to distinguish between independent contractors and employees, see Brock v. Superior Care, Inc., 840 F.2d at 1058-59; and (3) to assess whether an entity that lacked formal control nevertheless exercised functional control over a worker,

19

see Zheng v. Liberty Apparel Co., 355 F.3d at 72, state no rigid rule for the identification of an FLSA employer. To the contrary, as we noted in Zheng, they provide "a nonexclusive and overlapping set of factors" to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA. Id. at 75-76. With this in mind, we turn to the facts of the case before us.

4.      Under the Economic Realities Test, Bellevue Qualifies as Barfield's Employer as a Matter of Law

Because of the fact-intensive character of a determination of joint employment, we rarely have occasion to review determinations made as a matter of law on an award of summary judgment. See generally Zheng v. Liberty Apparel Co., 355 F.3d at 76 n.13 (noting that two of three leading cases in this circuit were appeals from judgments following bench trials). Nevertheless, upon de novo review of this record, we conclude that, even when the historical facts and the relevant factors are viewed in the light most favorable to defendants, Bellevue's status as Barfield's joint employer is established as a matter of law.

a.      Bellevue Exercised Sufficient Formal and Functional Control Over Barfield's Work to Qualify as her Joint Employer

(1)      Bellevue's Formal Control Over Barfield's Work

The traditional four-factor test set forth in Carter v. Dutchess Community College, 735 F.2d at 12, for determining when an entity exercises sufficient formal control over a worker to be that worker's employer under the FLSA, strongly indicates that Bellevlue

20

should be deemed Barfield's joint employer as a matter of law. Bellevue had the undisputed power to hire and fire at will agency employees referred to work on hospital premises; Bellevue supervised and controlled agency employees' on-site work schedules and conditions of employment; and Bellevue maintained employment records confirming referred workers' certifications and the shifts they worked. The fact that the referral agencies themselves may have exercised "ultimate" authority in these areas does not alter the fact that Bellevue also exercised some authority which helps establish the economic reality of its status as a joint employer. See id.; see also Herman v. RSR Sec. Servs. Ltd., 172 F.3d at 139 (observing that joint employer's exercise of limited or occasional control did not remove employment relationship from protections of the FLSA).

In this case there is no question that Bellevue maintained employment records on the matter most relevant to overtime obligations under the FLSA: the hours worked at the hospital by temporary employees. Bellevue's apparent failure to organize these records in a way that readily alerted it to when an employee referred by multiple agencies, such as Barfield, worked more than 40 hours in a given week, does not alter the fact that, for whatever hours Barfield worked, the first, second, and fourth Carter factors all strongly support Bellevue's status as Barfield's joint employer.[7]

---

[7] Evidence that Barfield registered with multiple agencies because she knew that Bellevue did not permit single agency referrals for more than 40 hours in a given week only explains how she came to work overtime at the hospital. That fact does not bear on Bellevue's status as Barfield's joint employer for the time she did work.

Only the third Carter factor, relating to the determination of the rate and method of a worker's payment, is inconclusive. There is no question that Barfield was paid directly by the referral agencies in an amount set by them, which was less than what Bellevue paid the agencies for her services. Nevertheless, Bellevue did not lack total control over Barfield's pay. The fact that Bellevue calculated the hours Barfield worked and that it then paid the agencies an hourly rate for those hours, so that the agencies, in turn, paid Barfield an hourly rate for the exact same hours, indicates that Bellevue exerted some control over Barfield's pay. Certainly, Bellevue's calculations conclusively determined the number of hours for which Barfield would be paid. Further, the hourly rate Bellevue paid the referral agencies effectively set a cap on the hourly rate that the agencies would pay Barfield.

Whether formal control can be determined as a matter of law in this case based on three Carter factors admitting no other conclusion and one factor that does not tilt decisively either way is something we need not here decide. Cf. Zheng v. Liberty Apparel Co., 355 F.3d at 77 (noting, in discussing "functional control," that summary judgment may be granted to plaintiffs on FLSA claim "even when isolated factors point against imposing joint liability"). The record in this case established Bellevue's functional control over Barfield's work as a matter of law.

(2)     Bellevue's Functional Control Over Barfield's Work

Having reviewed the record de novo, we cannot improve on the district court's thoughtful analysis of the six Zheng factors relevant to determining functional control, which

22

we, therefore, adopt as our own. See Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 393-94. Like the district court, we independently conclude that the record admits no material issue of fact on the following Zheng factors: (1) Barfield worked on Bellevue's premises using Bellevue equipment; (2) no referral agency shifted its employees as a unit from one hospital to another, but instead each assigned health care workers, including Barfield, to the same facility whenever possible to ensure continuity of care; (3) Barfield performed work integral to Bellevue's operation; (4) Barfield's work responsibilities at Bellevue remained the same regardless of which agency referred her for a particular assignment; (5) Bellevue effectively controlled the on-site terms and conditions of Barfield's employment; and (6) Barfield worked exclusively for Bellevue. Further, like the district court, we conclude that the degree of control Bellevue exercised over the hiring and firing of agency employees only reinforces the economic reality that Bellevue exerted sufficient functional control over agency-referred workers to be treated as their joint employer.[8]

---

[8] Because the economic realities test depends on the totality of the circumstances arising in a particular employer-employee context, our decision today is limited to the facts of this case. We do not here consider, much less decide, questions not raised on this appeal, such as whether a worker referred by multiple agencies to multiple hospitals managed by a single entity would be able to demonstrate that those hospitals qualified as common joint employers responsible for FLSA overtime whenever the total hours worked at all the facilities exceeded 40 hours per week. Nor do we decide in this case whether the agencies that referred Barfield are joint employers not only with Bellevue but with each other so as to be obligated in common for overtime whenever Barfield's total referred hours exceeded 40 per week.

(3)     Defendants' Challenge to the Conclusion that Bellevue's Exercise of Control Qualifies It as Barfield's Employer

In challenging the conclusion that Bellevue's exercise of control over Barfield qualified it as her employer for purposes of the FLSA, defendants raise a number of arguments. First, they assert that the Zheng factors are relevant only to determining whether the employment arrangement at issue constituted a "subterfuge or sham arrangement[] designed to subvert the purposes of the FLSA." Defendants' Br. at 22; see also Defendants' Reply Br. at 9-10. This misreads Zheng. In that case, the court certainly recognized that courts could identify circumstances where situations generally not indicative of joint employment, such as typical outsourcing relationships, were, in fact, a subterfuge or sham structured to avoid FLSA obligations. See Zheng v. Liberty Apparel Co., 355 F.3d at 72, 76. But nothing in Zheng suggests, as defendants urge, that functional control factors are relevant only to identifying subterfuge. To the contrary, Zheng makes clear that the reason for "looking beyond a defendant's formal control over the physical performance of a plaintiff's work" is to give full "content to the broad 'suffer or permit' language in the statute." Id. at 75-76 (quoting 29 U.S.C. § 203(g)). In short, Zheng contemplates arrangements under which the totality of circumstances demonstrate that workers formally employed by one entity operatively function as the joint employees of another entity, even if the arrangements were not purposely structured to avoid FLSA obligations.

Defendants' second challenge to the award of summary judgment in this case presents

24

a variation on their subterfuge argument. They argue that the underlying purpose of Zheng's economic realities test is to "segregate those contracting arrangements lacking true economic purpose from normal, necessary business relationships." Defendants' Br. at 26-27. Defendants insist that Bellevue cannot be viewed as Barfield's joint employer because its use of referral agencies to secure the services of temporary health care workers was informed by a legitimate business concern, specifically, the present shortage of health care workers available for full-time employment. Indeed, defendants submit that such use of referral agencies constitutes a usual and accepted custom and practice throughout the health care industry.

At the outset, we note that defendants' argument is by no means evident. As Zheng itself recognized, the prevalence of an industry-wide custom is subject to conflicting inferences. While, on the one hand, it may be "unlikely" that a prevalent action is "a mere subterfuge to avoid complying with labor laws," on the other hand, the very prevalence of a custom may "be attributable to widespread evasion of labor laws." Zheng v. Liberty Apparel Co., 355 F.3d at 73-74.

More to the point, for reasons already discussed, defendants err in reading Zheng's observation about how duplicity can convert even an outsourcing arrangement into a joint employer relationship to require bad faith for joint employment. In Zheng, the court's particular concern focused on the relative weight to be accorded the third economic realities factor, i.e., the extent to which workers performed a discrete line-job integral to a

25

manufacturer's production process, in identifying joint employment relationships. "[M]indful that manufacturers, and especially manufacturers of relatively sophisticated products that require multiple components, may choose to outsource the production of some of those components in order to increase efficiency," Zheng signaled courts to "resist the temptation to say that any work on a so-called production line" should necessarily "attract heightened scrutiny" under the FLSA. Id. at 73. In this outsourcing context, "normal, strategically-oriented contracting schemes" do not fall "within the ambit of the FLSA." Id. at 76.

This case, however, involves no readily outsourced manufacturing work. The work at issue involved personal services performed on Bellevue's premises, using only Bellevue equipment. Further, unlike in Zheng, where the workers produced garments according to the manufacturer's instructions, but under the direct supervision of the subcontractors, when Barfield provided nursing assistance, she was directly supervised only by Bellevue staff. Indeed, the same work is routinely performed by Bellevue's full-time employees, with temporary agency-referred workers being hired to fill in when regular staff are unavailable. In short, nothing about these circumstances signals typical outsourcing by Bellevue. Rather, the record evidence convincingly demonstrates Bellevue's control over Barfield when she worked at the hospital as a temporary member of its staff of health care professionals. Under these circumstances, the law recognizes Bellevue as plaintiff's joint employer even absent a showing of subterfuge or business bad faith.

Defendants' third argument contends that the district court erred in identifying certain facts as undisputed, specifically, those related to Bellevue's supervision over Barfield relative to the referring agencies. In support, defendants point to Barfield's testimony that she was not "counseled by" Bellevue nurses responsible for her shift, and was not given "advice or guidance" by Bellevue staff about the patient care she was providing. As we noted at oral argument, we are skeptical of Bellevue's suggestion that it allows temporary workers to provide health care for hospital inpatients with no direction or supervision by its full-time staff. The matter need not be pursued, however, because no reasonable factfinder could draw that inference from Barfield's few isolated statements viewed in light of the record as a whole. As the district court observed, unrefuted evidence shows that Bellevue personnel carefully supervised and documented Barfield's work schedule, see Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 393, a factor indicative of control, see Zheng v. Liberty Apparel Co., 355 F.3d at 72 (noting scheduling control exercised by slaughterhouse in Rutherford Food Corp. v. McComb, 331 U.S. at 726, as relevant factor in identifying it as workers' employer). Moreover, as defendants themselves concede, because both federal and New York law required Bellevue to adhere to certain minimum standards of patient care, it supervised the care afforded by agency employees at least to this extent. Although Bellevue posits that this degree of oversight was not so systematic as to evidence the control required for joint employment, the law does not require an employer "to look over his workers' shoulders every day in order to exercise control." Brock v. Superior Care, Inc.,

27

840 F.2d at 1060 (concluding that infrequent supervisory visits were sufficient to evince requisite level of control for purposes of identifying defendant as employer under FLSA). In sum, because the evidence compels a singe conclusion, i.e., that the direction Barfield received as to the shifts she was to work at Bellevue, the way she was to record her work, and the specific care she was to provide hospital patients all came from Bellevue, the district court correctly found that Bellevue's supervision of Barfield's work at the hospital was established in favor of plaintiff as a matter of law.

Defendants also object to the district court's analysis of the second Zheng factor, i.e., whether the agencies had a business that could or did shift as a unit from one putative employer to another. Defendants assert that this question could not be decided as a matter of law because they did not concede that it was hospital policy to require the referral agencies to assign the same workers for extended periods of time. Defendants' argument fails because they point to no record evidence indicating that agency health care workers comprised units that shifted from hospital to hospital. Indeed, they cannot refute that Barfield herself was referred only to Bellevue and not to any other hospital. See Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 393. In the absence of such contrary evidence, the district court properly concluded that the second Zheng factor was established in favor of plaintiff as a matter of law.

Defendants further assert that the district court erred by failing to consider the agencies' significant control over Barfield's employment as evidenced by their training,

28

licensure, and certification requirements. We disagree. Carter v. Dutchess Community College, 735 F.2d at 11-12, makes clear that, even when one entity exerts "ultimate" control over a worker, that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer under the FLSA. In this case, Bellevue's formal and functional control over Barfield's employment was so convincingly established by the totality of the evidence as to permit the question of joint employment to be resolved against Bellevue as a matter of law.

Finally, defendants submit that Barfield's own conduct, specifically, using three different agencies to secure more than 40 hours per week of work at Bellevue when she knew the hospital had a policy against temporary employees working overtime, precluded an award of summary judgment in her favor. We disagree. Barfield's conduct explains <u>how</u> she came to work at Bellevue for more than 40 hours on some weeks. But it does not alter the economic reality that, for whatever hours she worked, Bellevue qualified as her joint employer. Defendants do not — and cannot — argue that Barfield, by working more than 40 hours on some weeks despite her knowledge of Bellevue's resistence to overtime, somehow waived her FLSA overtime rights. See <u>Barrentine v. Arkansas-Best Freight Sys., Inc.</u>, 450 U.S. 728, 740 (1981) (emphasizing "nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act"). To the extent defendants suggest that Barfield's use of multiple referral agencies prevented Bellevue from knowing that she was working overtime, the record precludes that conclusion as a matter of

29

law. Barfield signed in for every shift she worked at Bellevue, and a Bellevue supervisor confirmed and approved every hour she worked. Under these circumstances, Bellevue's own failure to maintain these work records in a way that allowed it readily to recognize when Barfield had worked a total of more than 40 hours in a given week prevents it from claiming that it lacked "actual or imputed knowledge" of the work Barfield was performing. Chao v. Gotham Registry, Inc., 514 F.3d at 287. In Chao, another case involving temporary health care workers, it was the referring agency that argued that it was not obliged to pay referred nurses overtime for hospital work performed without prior approval as required by agency rule. See id. at 288-91. We rejected the argument, concluding that the agency's receipt of after-the-fact notice of the nurses' total hours worked coupled with its failure to take more assertive steps to prevent such overtime work obligated it to pay FLSA overtime. See id. at 290-91. The conclusion applies with even more force in this case. Bellevue cannot demonstrate that Barfield's use of multiple agencies deprived it of knowledge of the total hours she worked at the hospital because Bellevue staff specifically approved all hours worked. To the extent Bellevue failed to maintain its work approval records in such a way as to readily identify when temporary nursing assistants worked more than 40 hours in a given week, that inaction by Bellevue would not permit a factfinder to conclude that it did not "suffer or permit" the overtime work to be performed. Id. at 290-91 (observing that employer who wishes to avoid paying overtime must make efforts to prevent employees from working overtime).

Thus, we conclude that defendants' challenges to summary judgment are uniformly without merit.

    b.  The Department of Labor's Interpretation of the FLSA Supports Treating Bellevue as Barfield's Joint Employer

In rejecting Bellevue's challenge to the district court's joint employer finding, we note that the challenged ruling is, in fact, supported by various opinion letters issued by the Department of Labor ("DOL"), the agency charged with enforcement of the FLSA. Statutory interpretations contained in DOL opinion letters, as opposed to those arrived at after formal agency adjudication or notice-and-comment rulemaking, are not binding authority, see Gualandi v. Adams, 385 F.3d 236, 243 (2d Cir. 2004), and do not command Chevron deference, see Christensen v. Harris County, 529 U.S. 576, 586-87 (2000) (citing Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984)). Nevertheless, such agency letters represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Gualandi v. Adams, 385 F.3d at 243 (citing Bragdon v. Abbott, 524 U.S. 624, 642 (1998)). Thus, this court has "often relied on DOL Opinion Letters for their persuasive value." Id.[9]

Like this court, the DOL views joint employment as a question to be resolved from

---

[9] Defendants assert that, because these opinion letters preceded our decision in Zheng v. Liberty Apparel Co., 355 F.3d 61, they should be afforded no consideration. We disagree because we do not rely on any opinions expressed in these letters that could be viewed as at odds with Zheng.

31

the totality of the evidence.  See generally Opinion Letter from Dep't of Labor, Wage & Hour Div., 2001 WL 1558966, at *1 (May 11, 2001) (identifying relevant factors to include (1) power to control or supervise workers or work performed; (2) power, whether alone or jointly, directly or indirectly, to hire, fire, or modify employment conditions of individual; (3) permanency and duration of relationship; (4) level of skill involved; (5) whether worker's activities are integral part of overall business operations; (6) where work is performed and what equipment is used; and (7) who performs payroll and similar functions).

In a case somewhat analogous to the one before us, the DOL considered whether a residential nursing facility that operated a home health care program to provide companion services for its outpatients through various referral agencies qualified as a joint employer with the agencies of the referred workers.  See Opinion Letter from Dep't of Labor, Wage & Hour Div., 1998 WL 852807, at *1 (May 15, 1998).  Like Bellevue, the nursing facility home health program paid the agencies an hourly rate for the aides they referred.  The agencies, in turn, hired and trained the aides, paid them a somewhat lower hourly rate, and provided them with benefits.  Some of the nursing facility's full-time employees worked for the referral agencies on their time off, which resulted in their sometimes working a total of more than 40 hours per week providing both inpatient care at the nursing facility and outpatient care through the home health program.  The DOL concluded from the totality of the circumstances that the health aides were jointly employed by the nursing facility and the referral agencies when they provided home health care.  Consequently, all the hours worked

32

at both the nursing home and in home health care had to be combined in determining FLSA overtime obligations, and both the nursing facility and the referral agencies were jointly and several liable for this overtime. See id.

The reasoning applies with equal force in this case. Although Barfield was not employed as a full-time Bellevue employee when agencies referred her for temporary work at the hospital, it is undisputed that her temporary work was performed exclusively at Bellevue on schedules set and approved by that hospital's staff. Thus, even though multiple agencies made the referral, each referral and each hour worked by Barfield, including total hours in excess of 40, was specifically approved by Bellevue.

A few years later, in a slightly different context, the DOL concluded that a hospital was a joint employer with individual inpatients of private duty nurses in light of the "great degree of control and supervision" evidenced by the fact that all work was performed on hospital premises, all equipment and supplies used by the private nurses were provided by the hospital, the hospital required the private nurses to report to the hospital's nursing office at the start and end of each tour, and the hospital was legally obligated to provide some oversight of the nurses and to take action if the nurses failed to comply with hospital policies. Opinion Letter from Dep't of Labor, Wage & Hour Div., 2001 WL 1558966, at *1 (supplementing previous Opinion Letter from Dep't of Labor, Wage & Hour Div., 1999 WL 1788146 (Aug. 24, 1999)). The identical control factors are evident in this case.

In sum, the cited examples reinforce our conclusion that the totality of the evidence

in this case supports the district court's determination that, as a matter of law, Bellevue was Barfield's joint employer, and liable for her overtime under the FLSA when the total number of hours she worked at that single facility exceeded 40 per week.

## B.  The District Court Did Not Err in Awarding Liquidated Damages

Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages.  See 29 U.S.C. § 216(b) ("Any employer who violates [the overtime provisions of the FLSA] shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages.").  The Portal-to-Portal Act, 29 U.S.C. § 251 et seq., which amended the FLSA, affords district courts discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective "good faith" with  objectively "reasonable grounds" for believing that its acts or omissions did not violate the FLSA.  Id. § 260.  This court has characterized the employer's burden as "a difficult one," emphasizing that "double damages [are] the norm and single damages the exception."  Herman v. RSR Sec. Servs. Ltd., 172 F.3d at 142; see also Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 71 (2d Cir. 1997).

To establish the requisite subjective "good faith," an employer must show that it took "active steps to ascertain the dictates of the FLSA and then act to comply with them." Herman v. RSR Sec. Servs. Ltd., 172 F.3d at 142; see also Reich v. S. New England Telecomm. Corp., 121 F.3d at 71.  The district court concluded that defendants failed to

34

adduce any evidence to carry this burden.  See Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d at 395 (observing that defendants "failed to establish that [it] took any affirmative action to determine if [its] actions were in compliance with the FLSA").  In challenging this determination, defendants assert that Bellevue showed that it paid referral agencies a flat hourly fee for their services in the good faith belief that the agencies were the sole employers of the referred workers, including Barfield.  Neither the payment nor the assumption that informed it, however, constituted an "active step[] to ascertain the dictates of the FLSA."  Herman v. RSR Sec. Servs. Ltd., 172 F.3d at 142.  Thus, this fact is insufficient, as a matter of law, to warrant an exception to the FLSA liquidated damages requirement.  Defendants also assert that they showed that Bellevue conducted thorough reviews and analyses of its payroll employees' records to ensure that they were paid in compliance with the provisions of the FLSA.  While such review constitutes an "active step," its purpose was plainly not "to ascertain the dictates of the FLSA" with respect to the issue at hand:  Bellevue's overtime obligations to its agency-referred workers generally or to Barfield in particular.  Here too, then, we agree with the district court that, as a matter of law, defendants cannot carry the heavy burden necessary to avoid liquidated damages.

C.     The District Court Acted Within Its Discretion in Reducing Attorney's Fees

In addition to providing for liquidated damages, the FLSA directs courts to award prevailing plaintiffs reasonable attorney's fees and costs.  See 29 U.S.C. § 216(b) (providing that "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or

35

plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action"). We afford a district court considerable discretion in determining what constitutes reasonable attorney's fees in a given case, mindful of the court's "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). While an erroneous application of law or clear error of fact may indicate abuse of this discretion, see id.; Patterson v. Balsamico, 440 F.3d 104, 123 (2d Cir. 2006), that is not this case.

In determining reasonable attorney's fees in this case, the district court employed a two-step technique whereby it first calculated a "lodestar" amount of $99,778.75, determined by multiplying the reasonable hours worked on the case (282.7 attorney hours, 2.3 travel hours, and 5.75 paralegal hours) by a reasonable hourly rate of compensation ($350 per attorney hour, $175 per travel hour, and $75 per paralegal hour), see Hensley v. Eckerhart, 461 U.S. at 433-34 & n.9, and then reduced this loadstar by 50 percent based on case-specific considerations, see Blanchard v. Bergeron, 489 U.S. 87, 94 (1989), specifically, plaintiff's failure to secure certification of the case as a collective action under the FLSA. See Barfield v. N.Y. City Health & Hosps. Corp., 2006 WL 2356152, at *1, *3.

In Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany, 522 F.3d 182 (2d Cir. 2008), this court recently traced the evolution of this two-step process and the confusion sometimes attending its application before concluding that the "lodestar" metaphor should be abandoned, see id. at 190. Henceforth, we have advised district courts,

in exercising their "considerable discretion . . . to bear in mind <u>all</u> of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate" to be used in calculating a "'presumptively reasonable fee.'" <u>Id.</u> (emphasis in original). The district court in this case, operating without the benefit of the <u>Arbor Hill</u> decision, did not employ its specific technique for determining a presumptively reasonable fee, but that is not a concern on this appeal where plaintiff does not challenge the lodestar calculation but only the 50 percent reduction applied to it.

In considering Barfield's fee challenge, we are mindful of the Supreme Court's observation that "the most critical factor" in a district court's determination of what constitutes reasonable attorney's fees in a given case "is the degree of success obtained" by the plaintiff. <u>Farrar v. Hobby</u>, 506 U.S. 103, 114 (1992); <u>accord</u> <u>Kassim v. City of Schenectady</u>, 415 F.3d 246, 254 (2d Cir. 2005); <u>Pino v. Locascio</u>, 101 F.3d 235, 237-38 (2d Cir. 1996). Barfield asserts that <u>no</u> fee reduction for lack of success was warranted in her case because she did, in fact, succeed on the single FLSA claim alleged in her complaint. She submits that a motion for FLSA collective action certification is not a claim and, thus, failure on such a motion does not support a fee reduction.

We are not persuaded. A district court's assessment of the "degree of success" achieved in a case is not limited to inquiring whether a plaintiff prevailed on individual claims. <u>See</u> <u>Kassim v. City of Schenectady</u>, 415 F.3d at 254. Both "the quantity and quality of relief obtained," as compared to what the plaintiff sought to achieve as evidenced in her

complaint, are key factors in determining the degree of success achieved. Carroll v. Blinken, 105 F.3d 79, 81 (2d Cir. 1997). Indeed, this comparison "promotes the court's 'central' responsibility to 'make the assessment of what is a reasonable fee under the circumstances of the case.'" Farrar v. Hobby, 506 U.S. at 114-15 (quoting Blanchard v. Bergeron, 489 U.S. at 96).

We agree with the district court that "plaintiff's primary aim in this litigation, as reflected in her complaint and in the first four months of litigation . . . was to certify a collective action." Barfield v. N. Y. City Health & Hosps. Corp., 2006 WL 2356152, at *2. As the district court noted, plaintiff had urged certification to secure relief for "thousands of workers. Id. Her motion failed because counsel could not make even the "modest factual showing" required to support an FLSA collective action. Id. It is against this background of anticipated relief for thousands that plaintiff's recovery of $1,744.50 in compensatory and liquidated damages for herself appears to reflect only a small degree of success. Indeed, plaintiff's failure to certify a collective action precluded declaratory and injunctive relief, which was sought on behalf of individuals, unlike plaintiff, who were still working for defendants. As noted above, the district court was rightly concerned that not reducing the fee award in these circumstances would pose two risks: (a) decreasing the incentive for plaintiffs' lawyers vigorously to litigate collective action certification, and (b) encouraging plaintiffs' lawyers to file collective action-based claims even where there is little basis for doing so. See id. at *3; see also Hensley v. Eckerhart, 461 U.S. at 436 (noting that "[i]f a

38

plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount . . . even where the plaintiff's claims were interrelated, non-frivolous, and raised in good faith").

Barfield asserts that, even if the district court acted within its discretion in reducing the fee to reflect her failure to certify a collective action, it abused its discretion in applying a 50 percent reduction, as opposed to subtracting the number of hours expended on plaintiff's unsuccessful attempt to certify a collective action. Specifically, plaintiff submits that, instead of the 142.5 hour reduction, the district court should have subtracted at most 63 hours of work, the time expended on the case up until the denial of collective action certification. While plaintiff's arithmetic has the virtue of simple application, we are not persuaded that the district court exceeded its discretion in concluding that this proposed reduction did not adequately reflect the plaintiff's limited success in this case. Barfield's potential recovery in this case was not, after all, a matter of debate, as in tort or civil rights cases. The amount of unpaid overtime was easily determined at the outset to be only $887.25. Even doubled for liquidated damages, this recovery does not reflect such a degree of success as to compel an award for the full attorney's fees incurred after denial of class certification.[10] In this respect

---

[10] We cannot determine the long-term benefits of this case to Barfield or any other temporary worker, for it is possible that Bellevue will now more strictly police its temporary workers' hours to avoid any overtime obligations.

the district court got it exactly right: the reasonableness of the attorney's fees incurred linked directly to the ability to maintain the case as an FLSA collective action. Accordingly, we identify no abuse of discretion in its decision to reduce the fee for the success in pursuing Barfield's claim by itself to $49,889.

III.  Conclusion

To summarize, we conclude

1. The district court correctly awarded summary judgment in favor of Barfield on her FLSA claim because, although she was employed by three different health care agencies who referred her for temporary nursing assistant assignments to Bellevue, the totality of the evidence demonstrated that Bellevue so controlled her work at the hospital as to permit no other conclusion than that Bellevue was her joint employer, liable under the FLSA for Barfield's overtime whenever she worked more than a total of 40 hours in a given week.

2. The district court properly awarded liquidated damages because Bellevue failed to establish its good faith and an objectively reasonable belief that it was in compliance with the FLSA.

3. The district court did not abuse its discretion in reducing attorney's fees to reflect plaintiff's failure to secure collective action certification.

Accordingly, the district court's judgments entered on June 5, and August 11, 2006, respectively, are hereby AFFIRMED.