Mario E. BAUTISTA HERNANDEZ, individually and on behalf of all others similarly situated, Plaintiff,

v.

**TADALA'S NURSERY, INC., Defendant.**

**Case No. 12–61062.**

United States District Court, S.D. Florida.

Signed July 3, 2014.

 

Karla C. Martinez, Gregory Scott Schell, Florida Legal Services Inc., Lake Worth, FL, for Plaintiff.

C. Randall Austin, C. Austin Law, P.A., Parkland, FL, for Defendant.

CONSENT CASE

BARRY S. SELTZER, United States Chief Magistrate Judge.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

THIS CAUSE came before the Court for trial upon the consent of the parties (DE 20, DE 21). For the reasons set forth more fully herein, the Court will enter judgment in favor of Plaintiff Mario E. Bautista Hernandez and against Defendant Tadala's Nursery, Inc.

I. *BACKGROUND*

On July 18, 2012, Mario E. Bautista Hernandez ("Plaintiff") filed a two-count Amended Complaint for Damages, Declaratory Relief, Injunctive Relief, Costs of Litigation and Attorney's Fees ("Amended Complaint") (DE 17) against Tadala's Nursery, Inc. ("Defendant"). On August 1, 2012, Defendant filed an Answer and Affirmative Defenses ("Answer") (DE 18), denying the material allegations of the

Amended Complaint. Thereafter, the parties litigated, and the Court decided, several pretrial motions.

The parties appeared for trial on May 6, 2014. Before commencing, the parties stipulated to the dismissal of Count I of the (two-count) Amended Complaint, which alleged violations of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801 *et seq.* ("AWPA").[1] The Court accepted the stipulation and dismissed the AWPA claim, Count I. The trial then proceeded as to Count II of the Amended Complaint, which alleged overtime violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* Following trial, the parties appeared for oral argument and then submitted their respective damages calculations (DE 86, DE 87).

The matter is now ripe for decision.

II. *FINDINGS OF FACT*

A. *The Parties*

Defendant is a wholesale nursery that produces and sells ornamental landscape plants at three Florida locations—Southwest Ranches, Sebring, and Fort Pierce. (DE 70). From 2009 to 2011, Defendant's annual gross sale revenues were $4 to $5 million per year. *Id.* at 3; Pradilla Test. at 87 (DE 80). Defendant's operations were overseen by its Vice President, Daniel Pradilla, and by its General Manager, Sebastian Gomez; each is an educated business professional, having earned a Master of Business Administration ("MBA"). Pradilla Test. at 86 (DE 80); Pradilla Test. at 16 (DE.81). Among Defendant's many employees were three driv-

---

**1.** Plaintiff brought Count I, the AWPA claim, individually and on behalf of all other similarly situated persons. Amended Complaint at 4–6 (DE 17). On December 27, 2012, Plaintiff moved for class certification with respect

to the AWPA claim, which the parties briefed and argued (DE 31, DE 34, DE 37, DE 53 and DE 54). On April 30, 2013, the Court entered an order denying the motion for class certification (DE 55).

ers who utilized the company's trucks—including a Ford,[2] a Chevrolet, and an International—to deliver plants to its customers and to move plants and related items within and among its three locations.[3]

Plaintiff was hired by Defendant to perform nursery work; he commenced employment on July 24, 2009, and remained employed through December 7, 2011. When he applied for employment, Plaintiff presented a Resident Alien card and a Social Security card in the name "Mario Bautista." Def.'s Exs. 2, 4. On a Form I–9 ("Employment Eligibility Verification"), he represented that he was a lawful permanent resident, and on a Form W–4 ("Employee's Withholding Allowance Certificate") he claimed 10 allowances, as had been suggested to him by Defendant's office staff. Pl.'s Test. at 50 (DE 80); Def.'s Exs. 1, 2, 4. Plaintiff, however, was neither legally present nor authorized to work in the United States; nor was he entitled to the 10 allowances he claimed on his W–4. Pl.'s Test. at 24 (DE 80).

After later being informed by a governmental agency that Plaintiff and several other employees had utilized false Social Security numbers, Pradilla instructed the employees to remedy the problem if they wished to retain their employment. According to Plaintiff, Pradilla specifically instructed him to change his name. *Id.* at 25–26. Thereafter, Plaintiff produced a new Employment Eligibility Verification form, Social Security card, and Permanent Resident Card—all in the name "Miguel Ortiz"—and he again claimed 10 allowances on a revised W–4, this time under the name "Ortiz." *See id.* at 26–27; Def.'s

Exs. 5, 7, 8. On this occasion too, the information provided by Plaintiff was false. *See id.* at 27. Yet, Defendant never availed itself of the federal government's free "E–Verify" program to confirm the accuracy of Plaintiff's representations. Pradilla Test. at 24–25 (DE 81). Thereafter, Defendant utilized either "Miguel Ortiz" or "Mario" when paying Plaintiff. Pl's Exs. 6, 7.

Throughout the course of his employment, Plaintiff worked primarily on an hourly basis, and Defendant recorded those hours. Pl.'s Ex. 1. Many weeks, Plaintiff performed additional work on a piece-rate basis; Defendant, however, failed to record those piece-work hours. Pl.'s Test. at 28–29 (DE 80); Pl.'s Ex. 1. At trial, Plaintiff testified that when he did perform piece-work, he did so 1 day per week from 7:00 a.m. to 5:00 p.m., that is, for 10 hours. At 5:00 p.m., he would transition to hourly labor, loading pots onto trucks for delivery to customers. Pl.'s Test. at 28–29 (DE 80). In response, Pradilla testified not to the number of hours Plaintiff devoted to piece-work labor, but to the approximate number of pieces—1-gallon and 3-gallon pots—he believed a nursery laborer could complete within a given time frame. He opined that a nursery laborer could fill 100 3-gallon pots in 30 to 45 minutes and 500 1-gallon pots in 60 minutes. Pradilla Test. at 10 (DE 81).

B. *Defendant's Payroll Records and Payments*

Defendant maintained two record-keeping systems for its payroll: one (Quick-Books) program to record and report em-

---

2. The Court received testimony from a Ford representative that Defendant's Ford truck had been manufactured in Mexico and that Ford does not maintain any manufacturing facility in Florida. Demarois Test. at 21 (DE 80).

3. Pradilla claimed that these trucks were not necessary to the company's business. Pradilla Test. at 115 (DE 80).

ployee wages and (income and payroll) tax withholding for the first 40 hours worked each week;[4] and another (Excel) program to record an employee's hours in excess of 40, as well as the number of piece-work units produced (but not the hours devoted to piece-work production). Moreover, Defendant openly acknowledged that it has a long-standing practice of not paying overtime labor at enhanced rates; it pays overtime at straight hourly rates—here, a base rate of $7.25 per hour—rather than at rates of time and a half. Nor does Defendant withhold and remit any taxes from employee overtime wages.[5] Pl.'s Ex. 8: Arenas Test. at 71–76 (DE 80); Pradilla Test. at 87–88 (DE 80); Pl.'s Ex. 1.

Defendant compensated Plaintiff by issuing two types of checks. For the first 40 hours Plaintiff worked each week, Defendant made its payroll checks payable to Plaintiff—"Mario Bautista" and, later, "Miguel Ortiz." Pl.'s Exs. 2, 4, 6, 8. But when Plaintiff worked in excess of 40 hours, Defendant made its payroll checks payable to a third party, who, in turn, would distribute shares of the check to Plaintiff and to other workers. Pl.'s Ex. 3, 5, 8. By way of example, for the week of January 22 to January 28, 2010, Defendant issued a check payable to "Jose Rojo" in the amount of $623.13. The paystub showed that of this $623.13 payment, $134.13 was due Plaintiff and the remainder was due three other employees. Defendant never reported this compensation to governmental authorities; nor did Defendant withhold or remit any taxes from this compensation. Pl's Exs. 3, 5, 8; Arenas Test. 67–68 (DE 80). And according to Defendant's own accountant, Defendant never advised him that it had been paying employee overtime by way of a tax-free group check. Wald Dep. at 8.

Defendant's two-track record-keeping system, therefore, not only enabled it to conceal from governmental authorities the full amount of employee wages and the corresponding tax obligations, but it also effectively concealed the company's failure to pay enhanced rates for overtime labor. Like its practice of not paying enhanced overtime rates, Defendant's practice of maintaining two sets of payroll records is a long-standing one; it has not changed since the company's inception (in the late 1980's). Pradilla acknowledged that Defendant never sought to determine—through legal counsel or through the Department of Labor—whether its overtime compensation and tax withholding prac-

---

**4.** On occasion, Plaintiff received payroll advances from Defendant, which the company recouped in subsequent pay checks. Arenas Test. at 63–64 (DE 80); Pl.'s Ex. 8. When recouping an advance, Defendant's QuickBooks records would show as gross earnings what were in truth net earnings—the actual gross for the first 40 hours, less the repayment for the payroll advance. Defendant would then withhold taxes based on the reduced (net) wages shown. By way of example, during the week of November 5 to November 11, 2010, Plaintiff was employed at the minimum wage rate of $7.25 per hour, and he was due gross wages of $290 for his first 40 hours of work ($7.25 × 40 hours). That week, however, Defendant deducted $150 for repayment of a payroll advance or loan, leaving Plaintiff with net wages of $140. Rather than showing gross wages of $290—and paying taxes (including the employer share of the payroll taxes) on that amount—Defendant instead showed and reported as gross wages only $140, resulting in a proportionately lower payroll tax payment. Pl.'s Ex. 8. Defendant's accountant testified that he was never advised of this procedure, and he made clear that taxes should have been paid on the $290 earned, not the $140 shown on the check. Wald Dep., Pl.'s Ex. 10 at 10–11.

**5.** At oral argument, in response to the Court's question, Defendant's counsel stated that he did not believe that Defendant paid the employer share of the payroll tax on the overtime compensation.

tices were legally compliant. Pradilla stated only that in 2007 a friend in the industry advised him that he had received a ruling exempting him from compliance with federal wage statutes owing to the local nature of the business.

### C. *Plaintiff's Compensation*

Plaintiff represented that Defendant had failed to produce either its QuickBooks data or its Excel spreadsheets. Accordingly, to reconstruct his earnings record, Plaintiff could offer only his own testimony and the payroll excerpts he had acquired from Defendant. Pl.'s Ex. 1. These payroll excerpts contain an entry—"Total Hours"—that reflects the number of hours Plaintiff devoted each week to hourly labor; they do not, however, reflect the number of hours devoted to piece-work labor, as Defendant failed to record that time. Pl.'s Ex. 1: Pl.'s Test. at 29 (DE 80). The payroll excerpts also contain an entry—"Botes"—showing the number of 3–gallon and 1–gallon pots that Plaintiff filled during those weeks in which he performed piece-work labor. In addition, the payroll excerpts contain an entry—"Hrs"—showing the compensation Plaintiff received each week for hourly labor in excess of 40 hours, and another entry—"Total a Pagar"—showing the aggregate compensation Plaintiff received for hourly labor in excess of 40 hours and, when applicable, piece-work labor.

### III. *CONCLUSIONS OF LAW*

Defendant argues that Plaintiff is not entitled to any relief because he procured and maintained his employment through fraudulent representations. Defendant further argues that it is not subject to the requirements of the FLSA because it did not operate in interstate commerce. Defendant acknowledges that if the FLSA were to apply and if Plaintiff were not foreclosed from recovering, it would be liable for unpaid overtime for those weeks in which Plaintiff performed hourly labor only. But for almost all weeks in which Plaintiff performed both piece-work and hourly labor, Defendant maintains that it did not violate the FLSA overtime provisions. Defendant explains that in such weeks its piece-work rates more than adequately compensated Plaintiff for any overtime compensation he may have been due. Further, Defendant argues that even if it had violated the FLSA's overtime compensation requirements, the operative limitations period is two years, not three, as its violations were not "willful." Finally, Defendant argues that it is not liable for liquidated damages because it held a "good faith" belief that it was complying with the law.

As to each argument, the Court concludes otherwise.

### A. *Plaintiff's False Representations*

Defendant argues that Plaintiff cannot recover under the FLSA because he fraudulently procured and maintained his employment. That Plaintiff made false representations and provided false documentation to secure and later retain his employment is not disputed. That Defendant was misled or induced to rely on those false representations in hiring and retaining Plaintiff is not plausible.

When Plaintiff first applied, Defendant chose not to avail itself of the E–Verify system to confirm Plaintiff's information. Defendant's office staff even advised Plaintiff to enter an excessive number of allowances—10—on his W–4. When Pradilla was later advised by a government agency that the Social Security numbers provided by Plaintiff and several other employees were false, he advised Plaintiff to change his name. When Plaintiff returned with new residency and Social Security cards—

under the name "Miguel Ortiz"—Defendant permitted Plaintiff to continue working, again without availing itself of the E–Verify program to confirm this new information. Thereafter, Defendant issued its official paycheck (for the first 40 hours) to Plaintiff in the name "Miguel Ortiz," but it issued at least one third-party check that still showed the name "Mario" on the paystub. Defendant, therefore, cannot plausibly claim to have been deceived.

■ Yet, even if Defendant had genuinely been deceived into hiring and later retaining Plaintiff, the Eleventh Circuit instructs that recovery under the FLSA would not be foreclosed. In *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir.2013), Augustin Milan was among several employees of Safe Hurricane Shutters who had filed suit to recover unpaid overtime wages under the FLSA. Milan prevailed at trial and was awarded unpaid overtime and liquidated damages. *Id.* at 1305. On appeal to the Eleventh Circuit, Safe Hurricane Shutters argued that the *in pari delicto* doctrine barred Milan's FLSA recovery. *Id.* at 1306. The doctrine of *in pari delicto* provides that "a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." *Id.* In this instance, the employer argued that the doctrine foreclosed Milan's FLSA recovery because he was an undocumented alien who had not been authorized to work in the United States, because he had applied to work under a false Social Security number, and because he had failed to accurately report his income to the IRS. *Id.*

■ The Eleventh Circuit rejected Safe Hurricane Shutter's argument that because it would not have hired Milan absent his use of a false Social Security number he is barred from recovering. The court first observed that Milan's ability to recover unpaid wages under the FLSA does not rest upon his immigration status; the court noted that it had previously held that undocumented aliens are "employees" who may recover unpaid wages under the FLSA. *Id.* at 1306 (citation omitted). The court then set forth the limitations of the *in pari delicto* defense,. explaining that it could "bar recovery under a federal statute only where (1) the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of the suit would not substantially interfere with the statute's policy goals." *Id.* at 1308. The court did not need to reach the second prong (and determine whether the *in pari delicto* doctrine is consistent with the policies underlying the FLSA), as it determined that the first prong had not been satisfied. *Id.* at 1308. To satisfy the first prong, Safe Hurricane Shutters would have had to show that Milan was "an active, voluntary participant in the unlawful activity *that is the subject of the suit*"—the overtime payment practices. *Id.* at 1308 (citations omitted) (emphasis in original). Because Milan did not participate in Safe Hurricane Shutters' decision whether to pay overtime wages in accordance with the FLSA, the *in pari delicto* doctrine does not bar his recovery, notwithstanding his use of a false Social Security number to secure the employment and his other violations of law.

■ Here, Plaintiff's wrongdoing mirrors that of Milan. Plaintiff was an undocumented alien who had provided a false Social Security number in securing his employment and who made other false representations (as to his withholding allowances) to avoid his tax obligations.' Hence, even if Plaintiff had genuinely misled Defendant—a proposition rejected by this Court—Plaintiff would still be entitled to the protections of the FLSA because he did not participate in determining Defendant's overtime compensation practices,

the subject of this suit. The rationale for not foreclosing such an employee's recovery was articulated by the *Lamonica* Court: an FLSA award "does not itself condone [the employee's] violation," rather it "ensures that the employer does not take advantage of the violation by availing [itself] of the benefit of undocumented workers' past labor without paying for it in accordance with minimum FLSA standards." *Id.* at 1308 (citation omitted).

### B. *FLSA Coverage*

■ Defendant argues that it is not subject to the overtime compensation requirements of the FLSA. The statute requires "employers who meet its preconditions ... to provide overtime pay where workers exceed forty hours per week." *Polycarpe v. E & S Landscaping Serv. Inc.*, 616 F.3d 1217, 1220 (11th Cir.2010) (citing 29 U.S.C. § 207(a) (overtime pay)). To recover overtime pay, however, an employee must first establish he is protected by the FLSA based on either individual employee coverage or employer enterprise coverage. *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1298–99 (11th Cir. 2011). Where an enterprise is covered, all its employees are entitled to FLSA protection. But where an enterprise is not covered, individual employees may still be entitled to FLSA protections.

### 1. *Individual Employee Coverage*

■ "An employee is subject to individual coverage if he is *directly* and *regularly* 'engaged in' interstate commerce." *Josendis*, 662 F.3d at 1315 (emphasis in original) (citing *Thorne v. All Restoration Servs. Inc.*, 448 F.3d 1264, 1266 (11th Cir.2006)). As the Eleventh Circuit has explained:

> [F]or an employee to be "engaged in commerce" under the FLSA, he must be directly participating in the actual movement of persons or things in interstate

commerce by (i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel.

*Thorne*, 448 F.3d at 1266 (citations omitted).

■ Plaintiff worked in the planting, cultivating, and harvesting operations of Defendant's open-air plant nursery. Plaintiff, therefore, neither worked for an instrumentality of interstate commerce nor regularly used instrumentalities of interstate commerce in his work. Accordingly, he cannot avail himself of individual FLSA coverage.

### 2. *Employer Enterprise Coverage*

■ For an employer to be subject to enterprise coverage under the FLSA, an employee must show that he was " 'employed in an enterprise engaged in commerce or in the production of goods for commerce.' " *Josendis*, 662 F.3d at 1298–1299 (citing 29 U.S.C. § 207(a)(1)). An "[e]nterprise engaged in commerce or in the production of goods for commerce" is one that:

> (i) has employees engaged in [interstate] commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or *materials* that have been moved in or produced for commerce by any person; *and*
>
> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

29 U.S.C. § 203(s)(1)(A)(i)-(ii) (emphasis added).

■ That Defendant's gross annual sales exceeded $500,000 is not disputed; its average gross during the relevant period was approximately $4,000,000. At issue is whether Defendant's employees handled or worked on "goods" or "materials" that had been moved in interstate commerce. *See Polycarpe*, 616 F.3d at 1228 (stating that "[t]he inquiry for enterprise coverage under the FLSA is whether the 'goods' or 'materials' were in the past produced in or moved interstate") (citation omitted). While "goods" are subject to an ultimate-consumer exception, such that they do not trigger enterprise coverage if they are consumed by the employer, "materials" are not subject to that exception. *Id.* at 1222; *see also* 29 U.S.C. § 203(i). The FLSA defines "goods" as "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof." 29 U.S.C. 203(i).

Although the FLSA does not define "materials," the Eleventh Circuit has stated that "[w]hether an item counts as "materials" will depend on two things." *Polycarpe*, 616 F.3d at 1225. First, a court must determine "whether, *in the context of its use*, the item fits within the ordinary definition of 'materials' under the FLSA." *Id.* at 1225–26 (emphasis in original). The Eleventh Circuit defines "materials," as used in the FLSA, as "tools or other articles necessary for doing or making something." *Id.* at 1226. Second, a court must determine "whether the item is being used commercially in the employer's business." *Id.* at 1226. To be used commercially in the employer's business, the "materials" "must have a significant connection with the employer's commercial activity; the

business may not just somehow internally and incidentally consume the item." *Id.*

To illustrate the difference between "goods" and "materials," the Eleventh Circuit has offered the following example:

> Depending on how they are used, china dinner plates that are produced out of state, for instance, could count as either "goods" or "materials." Where a catering business uses the china plates at a client's banquet, the plates count as part of the "materials" necessary for serving a catered meal. But, where a department store sells the same china plates as stand-alone items, the plates count as "goods" for that retailer.

*Id.*

Defendant would have this Court conclude that its employees did not handle or work on goods or materials that had been moved in commerce. It argues that its nursery business is located exclusively within the confines of the state of Florida and that it services only in-state customers. It further argues that its business is limited to growing and selling native plants and trees; no seeds are purchased, and the plants and small trees are grown in Florida soil and transplanted to Florida soils. The facts and the law, however, yield a different conclusion.

It is undisputed that Defendant employed three truck drivers and acquired several trucks to deliver its plants to customers and to transport plants and related items both within and among its three Florida locations. It is also undisputed that Defendant's Ford truck—if not all of its trucks [6]—had been manufactured outside the state of Florida. The only issue, therefore, is whether, as a matter of law,

---

6. *See* Fed.R.Evid. 201(b)(2) (permitting court to notice facts not subject to reasonable dispute as they may be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

the trucks qualify as "goods" or as "materials."

■■■ Here, Defendant's business is to grow and sell plants. Because Defendant's employees used the trucks to deliver plants to customers and to transport plants and related items among the company's three locations, the trucks are "materials"; they are tools or articles used by Defendant in the performance of its nursery business.[7] *See Polycarpe v. E & S Landscaping Serv., Inc.,* 821 F.Supp.2d 1302, 1307 (S.D.Fla.2011) (concluding that trucks belonging to landscaping business are "materials" because they are used to transport company employees and landscaping equipment to each work site). Furthermore, despite Pradilla's contention that the trucks are not necessary, the Court concludes that they have a very significant, not merely incidental, connection to Defendant's nursery business. To paraphrase the District Court decision in *Polycarpe,* which involved a landscaping business, Defendant's "trucks are *an integral tool* used by at least two employees of [its] commercial [nursery] business...." *Id.* (emphasis added).

In sum, Defendant's Ford truck not only qualifies as a "material" that has traveled in interstate commerce, but it also has a significant connection to Defendant's commercial activity, such that it triggers enterprise coverage under the FLSA. Plaintiff, therefore, is entitled to the protections of the FLSA, notwithstanding his illegal presence in the United States and his providing false information and documentation to secure and maintain his employment. *See Patel v. Quality Inn South,* 846 F.2d 700, 706 (11th Cir.1988); *Martinez v. Mecca Farms, Inc.,* 213 F.R.D. 601, 604–05 (S.D.Fla.2002).

### C. *Overtime Compensation*

Defendant concedes that it did not pay Plaintiff an overtime premium (of one-half the regular rate) for those weeks in which he performed hourly labor only. But Defendant contends that for those weeks in which Plaintiff performed both hourly labor and piece-work labor, its compensation rates for piece-work resulted in Plaintiff's receiving wages that exceeded any required overtime premium. Defendant's argument, however, is not supported by the facts.

#### 1. *FLSA's Overtime Compensation Requirements*

■■■ The FLSA requires that employers pay their employees (at least) one and a half times the "regular rate" for any work in excess of 40 hours per week. 29 U.S.C. § 207(a)(1) (prohibiting "a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed"). When a covered employee is not paid the overtime wage, the FLSA provides a private cause of action against the employer for unpaid wages. 29 U.S.C. § 216(b); *Josendis,* 662 F.3d at 1298. Significantly, however, the law does not require that an employee be compensated solely on an hourly rate; an employee may also be compensated on a "piece-rate, salary, commission, or other basis," provided that "the overtime compensation due to [the] employee[ ] must be computed on the basis of the hourly rate derived therefrom." 29 C.F.R. § 778.109(2013).

The "regular rate" is the basis for any overtime computation. The regular hourly rate is determined by dividing an employ-

---

7. The trucks cannot be deemed to be "goods," as Defendant does not sell or deal in trucks.

*See Polycarpe,* 616 F.3d at 1226 (distinguishing "goods" from "materials").

ee's total remuneration in a given workweek by the total number of hours worked that week. *Id.* When an employee performs only hourly labor, "the hourly rate is the 'regular rate,'" and the overtime rate is one and a half times this "regular rate." 29 U.S.C. § 207(a)(1); 29 C.F.R. § 778.110. Stated differently, the overtime premium is simply one-half the "regular rate." *See id.* Multiplying this overtime premium by the number of overtime hours worked yields the unpaid overtime. *See id.*

■ But when an employee works at two or more rates—here, performing both hourly and piece-work labor—calculating the "regular rate" is more complex; it is a weighted average of the rates. According to the Code of Federal Regulations:

> Where an employee in a single workweek works at two or more different types of work for which different non-overtime rates of pay . . . have been established, his regular rate for that week is the weighted average of such rates. That is, his total earnings . . . are computed to include his compensation during the workweek from all such rates, and are then divided by the total number of hours worked at all jobs.

29 C.F.R. § 778.115; *see also* 29 C.F.R. § 778.111 (stating that "[w]hen an employee is employed on a piece-rate basis, the regular hourly rate of pay is computed by adding together total earnings for the workweek from piece rates and . . . other hours worked," the sum of which "is then divided by the number of hours worked in the week for which such compensation was paid"). Stated differently, "[w]hen an employee works part of the week at hourly and part at piece rates, the rule has been that the employer must compute the employee's regular rate by dividing total wages earned by total hours worked under both rates." Guide to Employment Law

and Regulations, "How to Compute Overtime" § 13.32.

Once this "regular rate" is determined for the employee performing both hourly and piece-work labor, the overtime premium, again, is simply one-half the "regular rate." *See* 29 U.S.C. § 207(a) and 29 C.F.R. § 778.107 (requiring that overtime be paid at "rate not less than one and one-half times the regular rate"); *see also* 29 C.F.R. § 778.111(a) ("For overtime work the pieceworker is entitled to be paid, . . . one-half this regular rate of pay multiplied by the number of hours worked in excess of 40 in the week."). To illustrate:

> [An employee] works 40 hours a week at the plant and is paid $7 an hour, or $280. In the same workweek he earns $60 for 10 hours of piecework done at home. His hourly rate of pay is $6.80 [ ($280 + $60)/50]. As overtime he gets an extra half-time for the 10 hours he worked over 40, or $34 [10 × $3.40]. His total wage for the week is $374 [$280 + $60 + $34].

Guide to Employment Law and Regulations, § 13.32.

■ Not only does the law provide guidance for calculating the "regular rate" (and, hence, the overtime premium) for an employee performing both hourly labor and piece-rate labor, but it also provides guidance—a burden-shifting framework—for ascertaining the number of hours worked where the employer has failed to keep adequate records. *See Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). To recover under the FLSA, an employee must initially show that the statute was violated and produce evidence to show the nature and extent of the work performed as a matter of just and reasonable inference. *See Id.* at 687, 66 S.Ct. 1187. Where an employer has kept complete and accurate records as required by the FLSA, the

**1242**

court can readily determine whether the required wages have been paid. *Id.* But where the employer has not kept such records, the court must look to other evidence. *Id.* Such evidence will frequently be anecdotal and imprecise, as employees seldom keep records regarding their own work. *Id.* The employer may then come forward with its own evidence or seek to negate the employee's testimony. *Id.* The Eleventh Circuit has summarized this burden-shifting framework:

> The FLSA places upon the employee-plaintiff "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). However, if the employer failed to keep time records, as in this case, that burden is relaxed. Specifically, in that circumstance an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the *precise amount of work performed* or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. *Id.* at 687–88, 66 S.Ct. 1187.

*Lamonica*, 711 F.3d at 1315 (emphasis added). Employees, therefore, may recover even though the amount may be uncertain and the damages difficult to calculate.

*Washington v. Miller*, 721 F.2d 797, 803 (11th Cir.1983) (farmworker employees met their prima facie burden for recovery under the FLSA despite the fact that "[t]estimony as to the hours worked varied widely and was often confused and contradictory"); *Reeves v. Int'l Tel. & Tel. Corp.*, 616 F.2d 1342, 1352 (5th Cir.1980) [8] (employee established his claim with estimates of hours based upon "the rough computations of his subconscious mind"); *Marshall v. Mammas Fried Chicken, Inc.*, 590 F.2d 598, 599 (5th Cir.1979) (employee met prima facie burden with evidence that was demonstrably inaccurate, as the inaccuracy was due to the employer's failure to keep more accurate records).

Here, Defendant failed to record the number of hours devoted to piece-work labor. Although Plaintiff did not keep records of his own, he did offer testimony concerning the number of hours he devoted to piece-work. The Court credits Plaintiff's testimony that when he did perform piece-work, he did so 1 day per week from 7:00 a.m. to 5:00 p.m., that is, for 10 hours. At 5:00 p.m., he would transition to hourly labor, loading pots onto trucks for delivery to customers. Pl.'s Test. at 29 (DE 80). The Court recognizes that the number of piece-work units produced varied by week and that the 10–hours to which Plaintiff testified lacks mathematical precision. Nonetheless, the Court concludes that 10 hours is a fair and reasonable approximation of his piece-work labor.

By contrast, the Court declines to credit the testimony of Pradilla as to the rates at which he believes laborers generally can perform piece-work. Pradilla did not testify as to the rate—let alone the "precise" rate, *Lamonica*, 711 F.3d at 1315—at which Plaintiff performed piecework. Nor

8. In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

did he make any effort to record the hours that Plaintiff devoted to piece-work labor. Moreover, in large measure, Pradilla's testimony was not credible or worthy of belief. The Court was particularly dismayed by his claim that it never occurred to him to question the propriety or legality of Defendant's failures to pay enhanced overtime rates or to withhold and remit taxes owing on the overtime labor or even to make overtime checks payable to the employee who had actually earned the income. Further undermining Pradilla's credibility was his attempt to defeat Plaintiff's argument in favor of "enterprise coverage" by testifying that the company's trucks are not actually necessary to the business. Pradilla Test. at 115 (DE 80). In sum, the Court rejects Pradilla's testimony, credits Plaintiff's testimony, and concludes Plaintiff has shown the nature and extent of his piece-work hours as a matter of just and reasonable inference. *Hodgson v. Ricky Fashions, Inc.*, 434 F.2d 1261, 1263–64 (5th Cir.1970) (holding that "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference").

### 2. *Overtime Compensation—Hourly Labor Only*

■ For those weeks in which Plaintiff performed only hourly labor, the Court can readily calculate any overtime wages due. The payroll excerpts show the total number of hours worked ("Total Hours") such weeks, and they show the amount actually paid for those hours in excess of 40 ("Hrs") at his base rate of $7.25. As the payroll excerpts reflect, Defendant paid Plaintiff at his base rate—straight-time—for each hour worked, whether or not the weekly total exceeded 40 hours. Because Plaintiff was entitled to an overtime premium of one-half the base or "regular rate" for each overtime hour worked, the unpaid overtime to which he is entitled can be computed by multiplying the overtime premium by any hours worked in excess of 40. From this amount, payroll taxes must then be withheld.

Defendant has acknowledged that it did not pay Plaintiff an overtime premium of one-half his "regular rate" in those weeks he worked more than 40 hours and performed hourly labor only. *See* 29 C.F.R. § 778.110. By way of example, during the week of July 31 to August 6, 2009, Plaintiff performed exclusively hourly labor for 60.5 hours at a base or "regular rate" of $7.25, for which he was paid $438.63. Pl.'s Exs. 1 and 9; DE 86–1. For each hour that he worked beyond 40, Plaintiff should have been paid an overtime premium equal to one-half the "regular rate" of $7.25 ($7.25 × .5), that is, a premium of $3.63 per hour. Accordingly, for his 20.5 overtime hours, Plaintiff should have received an additional $74.42 of overtime pay ($3.63 overtime premium × 20.5 overtime hours = $74.42 unpaid overtime). Given the 2009 payroll tax rate of 7.65%, *see* 26 U.S.C. § 3101(a)-(b), payroll taxes of $5.69 must be withheld ($74.42 unpaid overtime × .0765 payroll tax rate = $5.69 payroll tax) from the unpaid overtime due Plaintiff.[9] Plaintiff, therefore, is due wages of $68.72 ($74.42 unpaid overtime—$5.69 payroll tax = $68.72 wages due) for the week of July 31, 2009 to August 6, 2009 (DE 86–1).

9. As reflected on Plaintiff's Revised Summary Damages Chart (DE 86–1), the employee portions of the Medicare and Social Security taxes for 2009, 2010, and 2011 were 7.65%, 7.65%, and 5.65%, respectively. *See* 26 U.S.C. § 3101(a)-(b); The Tax Relief Unemployment Insurance Reauthorization, and Job Creation Act of 2010 (Pub.L. No. 111–312).

Plaintiff's Revised Summary Damages Chart (DE 86–1) details the overtime computations for each week of Plaintiff's employment, including those weeks in which he performed hourly labor only.

### 3. Overtime Compensation—Hourly Labor and Piece–Work Labor

For the weeks in which Plaintiff performed both hourly and piece-work labor ("hybrid weeks"), the overtime computations require a more detailed analysis of the payroll excerpts:

1) Identify hybrid weeks: the hybrid weeks contain a payroll excerpt entry showing the number of 3–gallon and 1–gallon containers ("Botes") filled by Plaintiff.

2) Determine total hours worked each hybrid week: add the credited 10 hours for piece-work labor to the number of hours shown in the payroll excerpt entry for hourly labor ("Total Hours").

3) Determine total weekly compensation: add $290 (compensation for the first 40 hours at $7.25 hourly wage) to the payroll excerpt entry ("Total a Pagar") showing compensation for both hourly labor in excess of 40 hours and piece-work labor. Pl.'s Ex. 1.

4) Determine "regular rate" of pay: divide Plaintiff's total weekly compensation (step 3) by the total number of hours Plaintiff worked each week (step 2).

5) Determine overtime premium (one-half the "regular rate"): multiply the "regular rate" of pay (step 4) by 0.5.

6) Determine unpaid overtime compensation: multiply the overtime premium (step 5) by the number of hours worked in excess of 40.

7) Determine damages: withhold payroll (Social Security and Medicare) taxes from the amount of unpaid overtime compensation (step 6).

Contrary to Defendant's contention, it failed to adequately compensate Plaintiff for the hybrid weeks. By way of example, for the week of January 29 to February 4, 2010, Plaintiff worked a total of 64.5 hours–54.5 hours of hourly labor and an additional 10 hours credited for piece-work labor. Pl.'s Exs. 1, 8, and 9; DE 86–1. Plaintiff was paid a total of $464.23 ($290 base pay + $174.23 overtime) for both hourly labor and piece-work labor. Pl's Ex. 1; DE 86–1. Plaintiff's "regular rate" of pay, therefore, was $7.20 per hour ($464.23 compensation / 64.5 hours worked = $7.20 per hour), and his overtime premium (extra half rate) was $3.60 per hour ($7.20 regular rate × 0.5 = $3.60). Because Plaintiff worked 24.5 hours of overtime, he is due unpaid overtime of $88.17 ($3.60 premium × 24.5 overtime hours = $88.17 unpaid overtime). Given a 2010 payroll tax rate of 7.65%, see 26 U.S.C. § 3101(a)-(b), a payroll tax of $6.74 ($88.17 unpaid overtime × .0765 payroll tax rate ≐ $6.74 payroll tax) must be withheld from the unpaid overtime due Plaintiff. Plaintiff, therefore, is due wages of $81.42 ($88.17 unpaid overtime-$6.75 payroll tax = $81.42) for the week of January 29 to February 4, 2010 (DE 86–1).

Plaintiff's Revised Summary Damages Chart (DE 86–1) details the overtime computations for each week of Plaintiff's employment, including those hybrid weeks in which he performed both hourly labor and piece-work labor.

### D. The Limitations Period

Defendant submits that any unpaid overtime computation be limited to the two-year period preceding the filing of the Complaint. It argues that the applicable limitations period is two years—not three—as any FLSA violation it may have

committed was not "willful." The evidence shows otherwise.

A "willful" violation of the FLSA enlarges the limitations period from two to three years. 29 U.S.C. § 255(a) (stating that a cause of action under the FLSA "may be commenced within two years after the cause of action accrued, . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"). A "willful" employer is one who "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). " '[R]eckless disregard' [i]s the 'failure to make adequate inquiry into whether conduct is in compliance with the [FLSA].' " *See Morgan v. Family Dollar Stores Inc.,* 551 F.3d 1233, 1280 (11th Cir. 2008); 29 C.F.R. § 578.3(c)(3) (stating that "an employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act . . . if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry").

The Court concludes that Defendant's failure to comply with the FLSA overtime provisions was "willful." Defendant is a multi-million dollar enterprise whose Vice-President (Pradilla) and General Manager (Gomez) both hold an M.B.A.; they are educated and well-informed managers of a successful enterprise. Yet, Defendant's long-standing practice was not to pay its employees at enhanced rates for overtime labor. Pradilla indicated that it never occurred to him to inquire into the lawfulness of Defendant's overtime compensation because he relied on past practice. Pradilla Test. at 87–89 (DE 80). He added that in 2007—

many years after Defendant's compensation practices had been implemented—a friend in the industry told him that he had secured a ruling exempting his own business from the requirements of the FLSA; Pradilla disclosed nothing more about the friend's business or about the details of the reported exemption. Significantly, Pradilla never inquired of the United States Department of Labor nor (prior to this litigation) did he seek legal counsel concerning the company's overtime obligations under the FLSA. Further evidencing Defendant's willfulness was its practice of not only maintaining separate records for overtime work but also failing to report to the government the wages paid for such work (at non-enhanced rates) and to remit any associated taxes. At best, Defendant acted in "reckless disregard" of the FLSA, as it failed to make an adequate inquiry— indeed, any inquiry—into whether its practices comported with the overtime provisions of the FLSA. At worst, Defendant knew that its compensation practices violated the FLSA, as it employed a two-track record keeping system that effectively concealed material information from the government.

Because Defendant's practices were "willful," the Court concludes that this action is governed by the three-year limitations period. As the initial Complaint (DE 1) was filed on June 1, 2012—and the Amended Complaint (DE 17) on July 18, 2012—the extended limitations period commenced before the July 24, 2009 start of Plaintiff's employment. Accordingly, Defendant is liable for each FLSA violation committed during the term of Plaintiff's employment—July 24, 2009, to December 7, 2011.

### E. *Liquidated Damages*

Finally, Defendant argues that it should not be required to pay a liquidated

damages award because its overtime compensation practices were undertaken in "good faith."

The FLSA provides that an employer "shall be liable to the employee or employees affected in the amount of ... their unpaid overtime compensation ... and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Although unpaid overtime wages must always be awarded, the court retains the discretion to withhold an award of liquidated damages where it finds that the employer has acted in "good faith." 29 U.S.C. § 260 (stating that in action to recover liquidated damages under the FLSA, "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] ... the court may, in its sound discretion, award no liquidated damages"). Absent an affirmative showing of "good faith," however, liquidated damages are mandatory. *Dybach v. Fla. Dep't of Corr.,* 942 F.2d 1562, 1566–67 (11th Cir.1991).

 The employer's burden of showing "good faith" has been characterized as "plain and substantial." *Barcellona v. Tiffany Eng. Pub, Inc.,* 597 F.2d 464, 468 (5th Cir.1979). The employer must prove both subjective and objective "good faith," that is, (1) that its actions were taken in a "good faith" belief that they did not violate the law and (2) that it had reasonable grounds for believing that its actions were not in violation of the law. *See* 29 U.S.C. § 260; 29 C.F.R. § 790.22(b); *Rodriguez v. Farm Stores Grocery, Inc.,* 518 F.3d 1259, 1272 (11th Cir.2008). Failure to establish either of those elements precludes a finding of "good faith." *Id.* Yet, even where the employer is able to establish both elements, any reduction or elimination of a liquidated damages award re-

mains discretionary with the Court. 29 C.F.R. § 790.22(b) (stating that "the court is permitted, but is not required, in its sound discretion to reduce or eliminate the liquidated damages which would otherwise be required").

 Here, Defendant cannot establish either element of the "good faith" standard. Defendant failed to take any meaningful steps to determine whether it was obligated to pay overtime wages under the FLSA; it chose instead to rely on past practice—the way things have always been done—and an isolated 2007 comment from an industry friend who reportedly stated that he was exempted from FLSA coverage. *See Barfield v. N.Y. City Health & Hosp. Corp.,* 537 F.3d 132, 150–51 (2d Cir. 2008) (stating that good faith not shown where employer failed to take "active steps to ascertain the dictates of the FLSA and act to comply with them"). Defendant cannot shield itself from a liquidated damages award by its deliberate failure to learn whether it was obligated to pay enhanced overtime rates, undoubtedly one of the most critical aspects of employee compensation. *See Washington,* 721 F.2d at 804 (employer may not "rely on ignorance alone" to avoid liquidated damages). Furthermore, Defendant's payroll and recordkeeping practices—paying employee overtime through third-party checks, concealing that compensation from the government, and failing to withhold and remit associated taxes—belie Defendant's contention that it had acted in a "good faith" belief that it was not violating the law. The Court, therefore, concludes that Plaintiff is entitled to recover not only his unpaid overtime compensation (minus payroll tax withholding), but also an additional equal amount as liquidated damages.

### F. Summation

The Court concludes that Plaintiff's wrongdoing in this matter does not fore-

close his recovering under the FLSA, a statute to which Defendant is subject owing to its enterprise coverage. The Court further concludes that Defendant failed to comply with the overtime compensation requirements of the FLSA and that it is liable for unpaid overtime compensation (minus payroll tax withholding) and an additional equal amount as liquidated damages for the full term of Plaintiff's employment. As Plaintiff's Revised Summary Damages Chart (DE 86–1) shows, for the term of his employment, Plaintiff's damages—unpaid overtime (minus payroll tax withholding) and liquidated damages—total $13,324.18.[10]

██ Finally, pursuant to 29 U.S.C. § 216(b), the Count concludes that Defendant is liable for the costs of this action and for an award of reasonable attorney's fees, exclusive of any fees and costs attributable exclusively to the dismissed AWPA claim.[11]

**10.** As Plaintiff's Revised Summary Damages Chart (DE 86–1) shows, unpaid overtime (minus payroll tax withholding) is $6,419.42, yet liquidated damages are $6,904.78. Liquidated damages here appear to be more than an additional equal amount because they are not considered "wages" and, therefore, payroll taxes have not been withheld from this component of damages. The rationale for withholding payroll taxes from unpaid overtime but not from liquidated damages is set forth more fully in Internal Revenue Service Ruling 72–268 (1972) *available at* 1972 WL 29856:

> [S]ince the payments of unpaid minimum wages and unpaid overtime compensation were "remuneration for employment," it is held that the payments are "wages" for purposes of the Federal Insurance Contributions Act, the Federal Unemployment Tax Act, and the Collection of Income Tax at

Source on Wages, whether the amounts are paid as a result of a judgment of a court or in accordance with a stipulation or settlement reached by the parties involved. Since payments representing liquidated damages made by an employer to his employees pursuant to 29 U.S.C. 216(b) are not remuneration for employment, it is further held that they are not "wages" for Federal employment tax purposes, including income tax withholding.

**11.** The Court encourages the parties to confer in a good faith effort to reach agreement on an amount of reasonable fees and costs. In the event that the parties are unable to agree, Plaintiff may then apply for an award of fees and costs, and Defendant may respond thereto.